## TEAL v. SOUTHERN PAC. RY. CO. et al.
### No. 9406.

Court of Civil Appeals of Texas. Galveston.
May 22, 1930.

Dissenting Opinion May 27, 1930.
Rehearing Granted July 19, 1930.

Rehearing Denied Oct. 2, 1930.

Devereaux Henderson, James A. Copeland, and J. A. Collier, all of Houston, for appellant.

Baker Botts, Parker & Garwood, John T. Garrison, and Arterbury & Coolidge, all of Houston, for appellees.

GRAVES, J.

Appellant sought damages of the several appellees for personal injuries claimed to have followed upon his effort to reboard at Houston one of their trains on the Houston East & West Texas Railway, after he (having first become a passenger for hire by entering one of its coaches with a ticket that entitled him to ride on that train from Houston to Humble) had alighted therefrom to retrieve his hat, which along with his ticket had fallen out of the window; negligence proximately causing his injuries was generally and in a number of specified and reiterated particulars charged against the appellee carriers, especially the Houston East & West Texas Railway Company: First, in this antecedent averment, "that just as plaintiff stepped off of said train, and before he had a reasonable time within which to re-board and re-enter said coach or car, said train started up and began moving slowly; that plaintiff attempted to re-board said train and stepped upon the platform or step at the entrance and door to said coach; that while plaintiff was so attempting to re-board and re-enter said coach, and had just stepped upon the platform and was standing upon same, said defendants' agent, servant and employee wantonly, recklessly, carelessly and negligently

slammed and closed the door to said entrance in plaintiff's face; that said door struck plaintiff and violently knocked plaintiff off of said platform or step; that plaintiff was thrown to the ground with great force and violence, and as he fell his right arm and hand was thrown beneath the trucks and wheels of said train; that said wheels passed over plaintiff's right hand and so greatly crushed and mangled same that it was practically cut off"; next, in greatly extended particularization, the substance of which is reflected in these paragraphs: "That said defendants, their agents, servants and employees, had actual knowledge and notice that plaintiff was going to alight and that plaintiff did in fact leave said train for the temporary purpose of recovering his hat and ticket; that said defendants, their agents, servants and employees, knew or by the exercise of reasonable care and prudence could and ought to have known, under all the circumstances and facts, that plaintiff was going to re-board and re-enter said train as a passenger thereon as soon as he recovered his hat and ticket; that said defendants, their agents, servants and employees, negligently failed to warn plaintiff that said train would start up and leave the station immediately and before he would have an opportunity to re-board and re-enter said train; that they negligently failed to warn plaintiff of the dangers of boarding or attempting to board said train while it was moving; that said defendants, their agents, servants and employees, negligently failed to look on either side of said train for the purpose of ascertaining whether or not plaintiff or other passengers had an opportunity to safely board same, or whether or not plaintiff or other passengers were attempting to board same; that said defendants, their agents, servants and employees, on said occasion negligently failed to hold up the movement of said train or keep same from starting in order to allow plaintiff time within which to alight for the temporary purpose aforesaid and to re-board same; that defendants, their agents, servants and employees, on said occasion negligently failed to allow or give plaintiff a reasonable and sufficient time to re-board and re-enter said train and coach after he had alighted for the purpose aforesaid; that said defendants, their agents, servants and employees, negligently failed to keep said door on said train and coach open on said occasion in order to allow plaintiff to re-board and re-enter said train; that said defendants, their agents, servants and employees, negligently failed to stop said train when they discovered that plaintiff was in a position of peril in trying to re-board and re-enter said train; that said defendants, their agents, servants and employees, negligently failed to refrain from closing said door on said train when they knew, or by the exercise of ordinary care could have and ought to have known, that plaintiff was attempting to re-

board and re-enter said train and that said defendants, their agents, servants and employees, negligently failed to refrain from closing said door when they discovered that plaintiff was in a position of peril."

The appellees answered with a demurrer, a denial, and a plea of contributory negligence on appellant's part, all general.

Despite numerous exceptions and objections to its charge from appellant, among them that it did not present all the issues raised by the pleadings and evidence—especially that relating to the appellees' alleged negligence after appellant had been placed in a position of peril, concerning which he tendered six special issues that were refused—the trial court submitted the cause to a jury on special issues that at least essayed to cover all those raised on either side, except the one so complained about by appellant touching his alleged peril.

In response, while not answering many of the inquiries because of the conditional directions given them, the jury found:

(1) That the conductor, while neither knowing nor having reason to believe that plaintiff was a passenger on the train, knew or had reason to believe that he left the train on the occasion in question for the purpose of recovering his hat;

(2) That the plaintiff did not attempt to re-enter the car in which he had been sitting at the door of his exit;

(3) That defendant's agents and servants in charge of its train, before starting the same, negligently failed to look to see if plaintiff was attempting to reboard such train, which negligence was a proximate cause of his accident and injury;

(4) That the door was closed at the point and at the time the plaintiff attempted to re-enter the train, that he was negligent in attempting to re-enter at such point, and that such negligence was a proximate cause of his injuries;

(5) That the plaintiff was negligent in getting off the train without notifying the conductor that he intended to reboard it, and that such negligence was a proximate cause of his injuries;

(6) That $4,500 would reasonably compensate him for the injuries sustained.

Whereupon judgment on the verdict followed in favor of appellees; hence this appeal.

Aside from appellant's other contentions, we conclude that his ninth proposition, to the effect that "both the pleadings and the evidence in this case having raised the issue of discovered peril, it was error for the Court to refuse to submit this issue when properly requested by plaintiff," should be sustained; as the statement has shown, this was repeatedly pleaded as one among the several dis-

tinct acts of negligence relied upon for a recovery, and the testimony plainly raised it as a fact question for the jury; the learned trial court, though properly requested through objections to its absence in the charge given, as well as the tender of special inquiries at least sufficient to direct attention to the matter, refused to submit it at all.

As stated, this was a distinct act of negligence embodying a cause of action independent of those declared upon as resulting from the other acts of negligence alleged, and proof of appellant's contributory negligence as referable to it—even had it shown that he had been utterly foolhardy in getting into the situation it applied to—could have constituted no defense whatever to it; if the facts so alleged and testified to were true, a new duty arose on the trainmen's part to use all means at hand, consistent with the safety of the train, to protect him, irrespective of his own negligence. G., H. & H. Ry. Co. v. Sloman (Tex. Civ. App.) 195 S. W. 321, writ of error refused; Railway v. Breadow, 90 Tex. 26, 30, 36 S. W. 410.

Neither did the evidence underlying them nor the jury's findings shown under preceding paragraphs (2) and (4), respectively, that appellant did not attempt to re-enter the car in which he had been sitting at the door of his exit therefrom, and that the door was closed at the point and time he did attempt to re-enter, preclude or eliminate this issue; while he himself testified that he did try to get back at the same door, and that it was slammed shut in his face as he was standing on the steps trying to get in (the train operatives denying it), neither his pleading nor the proof as a whole on the subject limited his claim of actionable negligence with reference to his alleged perilous position to the state of case reflected in either finding; on the contrary, his averments, especially when given the benefit of all reasonable intendments in the absence of any special exceptions, were broad enough to cover the application of that doctrine to whatever entrance he in fact attempted, and plainly, if not conclusively—the trial court having so assumed in submitting the inquiries and the jury having in effect found that to be a fact in returning answers (3) and (4)—the evidence likewise did tend to indicate that he attempted a re-entrance of the train at some door thereof, notwithstanding it may have been closed at the time.

Appellant was in material substance corroborated by other witnesses to this effect; that he first got on the train as a passenger having a ticket, lost his hat out of the window, and alighted to retrieve it; that before he got there his hat with the ticket in it was picked up outside by others when the train was just starting off and handed back to some one on the train, whereupon he turned and overtook the slowly moving train, climbed onto the steps of one of the coaches, and tried but failed to get inside, holding to the grab-irons at the side of the entrance until he fell off and under the wheels to his injury some distance east of Sixth street, apparently more than two blocks from where he got on; not only so, but witness after witness (several of them called by the appellees) testified to having seen him so hanging there, one of the latter, Mr. J. C. Tanner, after stating that he neither saw appellant get on nor when that door of the coach was closed, said that he saw him hanging to the side of the train that way, that he was still hanging there for some time after the train had passed Sixth street, and fell off after or just as it was rounding the curve in the track near the brewery; indeed, it seems to have been an uncontroverted fact that he did thus hang onto the train, every witness in position to know about that feature who testified saying that he saw him doing so, except the train operatives, who all denied seeing him; appellant himself, while elsewhere saying in effect that the conductor knocked him off by slamming the door in his face just as he attempted to enter, finally on cross-examination recapitulated his testimony on that detail with this statement:

"Wherever I hit the ground is the place where the door was slammed on me; when the door hit me it knocked me off on the ground. I do not know what distance that was from where I tried to get on the train—don't know about how far it was; can't guess at it. * * * I do not know how far the train went then before I fell off."

The point of his fall having been fixed at or beyond the curve in the railroad track by the witness Tanner, who said he pulled him out from under the train, and others, it results that he must have thus hung onto the outside of the train while it slowly traveled more than two blocks.

Every member of the train crew, the conductor, the porter, and the brakeman, admitted that it was reported to him that night just after the train started and while it was running slowly—perhaps never more than about five miles per hour—that a man was hanging on the outside of the train, which the conductor testified was a very unsafe practice and against the company's rules, yet no one of them made any effort to use either one of the two concededly sufficient means that were then at hand for averting the injury—stopping the train, or opening the door; not claiming that he was not in danger if in the position reported to them, the sole reason each and all gave for not employing the one or the other was that they investigated on receiving the report that the man was hanging on, and that he was not there, that they did not see him, adding that they both could and would have stopped the train and let him in, if he had been.

This denial of the trainmen that they either saw or knew appellant was hanging on the train in the situation the other witnesses testified to cannot be taken as conclusive, especially in view both of his own testimony that they did and of all the circumstances tending to contradict them, the question of whether they did or not being clearly one for the jury.

Such being the state of the record, we think the issue of discovered peril was raised and that the failure to submit it constituted prejudicial error. Railway v. Cannon (Tex. Civ. App.) 81 S. W. 778; Hines v. Arrant (Tex. Civ. App.) 225 S. W. 767; Railway v. Kopinitsch, 114 Tex. 367, 268 S. W. 923; Railway v. Wagner (Tex. Com. App.) 298 S. W. 552; Higginbotham v. Railway (Tex. Civ. App.) 155 S. W. 1025; Railway v. Yarbrough (Tex. Civ. App.) 73 S. W. 844; Railway v. Logan (Tex. Civ. App.) 184 S. W. 301; Railway v. Hammond (Tex. Civ. App.) 286 S. W. 483.

The judgment has been reversed and the cause remanded, with Associate Justice LANE dissenting.

Reversed and remanded.

LANE, J. (dissenting).

I dissent from the order of the majority of this court in ordering a reversal of the judgment of the trial court, such order being based solely upon a holding that the evidence raised the issue of discovered peril and therefore the court erred in refusing to submit such issue to the jury upon appellant's request therefor.

The appellant, and he only, testified that as he was attempting to board the train and was on the steps of the coach an employee (the conductor) of appellee let the platform at the door down on his foot and closed the door in his face, thereby knocking him from the train.

Upon the overwhelming weight of the evidence the jury found that the door of the coach at the point and at the time appellant attempted to re-enter the train was closed, and the evidence of every witness who claimed to have seen appellant try to enter the coach, except appellant himself, shows that appellant was not knocked from the train by the closing of the door in his face, as all of them testified that he was standing on the steps of the coach and holding to the hand bars at the entrance of the coach for quite a distance before he fell from the train. One or more of them testified that they knew the door, where he was holding to the hand bars with his foot on the steps, was closed.

The seeming intimation in the majority opinion, in view of the evidence and the finding of the jury, that the testimony of appellant that he was knocked from the train by the closing of the door in his face raised the issue of discovered peril, is, to my mind, preposterous. The only evidence of all the witnesses who testified relative to the position of appellant while attempting to re-enter the train, except appellant's testimony, is to the effect that appellant was not knocked from the train by the closing of the door in his face, but that he was hanging onto the coach with his foot on the steps and holding onto the hand bars at the entrance, while the door was closed, for quite a distance. Wherefore, I shall confine my discussion, in undertaking to show that there was no evidence calling for or authorizing the submission of the issue of discovered peril, to the evidence relative to the position of appellant as he hung on to the train, the discovery of the servants of appellee operating such train that appellant was hanging to the train, if any, and the acts shown to have been done by such operatives after such discovery, if any, to avert injury to appellant.

Peter Taylor, called by appellant, the plaintiff in the trial court, testified:

"When I looked out of the window I saw him hanging on part of the white coach. I don't know what coach it was but he was hanging on, I couldn't say whether it was the white coach or not, it was behind me, any way he was hanging on."

Again: "There was no one in that coach that spoke of the injury to the man; they didn't know the man was hurt. I didn't know it myself."

Again: "When I first saw him he was somewhere back there hanging on. * * * The last time I saw him he was hanging on and then I couldn't see him on account of the curve. The train had gone but a little distance when it went around the curve. * * * When I first saw him hanging on there the train was moving and the train kept going."

James Berry, the conductor in charge of the train, testified:

"The first thing that I knew about this transaction that night some darkey hollered to me that somebody was hanging on the side of the train; I was in the middle section of the car by that time as we didn't have any passengers. Then the porter, somebody told him about it; he was working towards the front of the train, and I told the porter to run out and see and if he found anybody to let them in. By that time we had reached the curve at the Brewery there and the porter came and told me he hadn't found anyone and we proceeded on."

Again: "As the train was leaving Houston I heard no commotion about a negro man getting off of the train and my slamming the door in his face. I did not see anybody trying to get back on that train and I did not slam the door in anybody's face. I did not let the trap door down on anybody; that would be impossible because the door closes first and the trap is on the inside. No negro man said anything to me

about anyone getting back on the train, leaving the train or anything else. * * * Before the train leaves it is not uncommon for people to come there and get on the train with other people and then leave when the train is fixing to leave; they do that most every night, it is a common occurrence both among white and colored people."

Again: "It would be my duty to stop the train for a passenger; there is times that you can open the door or trap and let passengers enter. We can open any of them and let a person in. I consider it perfectly safe for one to hang on a while because the grab irons are out of the way and so long as he holds on there wouldn't be any danger of his getting hurt, but it is a very unsafe practice and that is why we try to get them on and off as quick as we can. If necessary, I would stop the train for any passenger attempting to board the train who was holding on there. I didn't do it that night because I didn't see the man. It was reported to me that night and the porter got to the door as quick as he could and the man was gone. That was the center door, the door to the white compartment and he went to that door because he was beyond the door and got to the closest door then, and then if he had seen the man hanging on he probably would have stopped, if necessary. Any member of the crew determines when it is necessary, they have experience enough to know that. *I went to the first opening to see if I could see him. I did not only send one to open the door; there are two of them, the one in the rear of the first class car and the one in front of it.*"

Again: "We would stop to get a passenger on our road if we saw him hanging on the side of the train; we would certainly admit him and would stop the train if necessary to do so. It is against the rules as well as the law for them to board a moving train, and we stop if there is any danger of a man getting hurt. We did not stop on this occasion because the man was gone. I would have stopped the train if I had found him hanging on if I thought it was unsafe."

Charley Cone, porter on the train, testified that as soon as he heard that some one was swinging onto the train he and the brakeman went to see if any one was swinging to the train, but they saw no one; that he had not seen anybody hanging onto the train that night.

W. C. Matthews, brakeman of the train, testified that he got on the rear end of the train after it began to move, and that after the train had gotten to Sixth street a man told him that some one was hanging onto the coach, and that he immediately went to see if there was any one hanging to the coach, and after an investigation he saw no one hanging to the train.

On cross-examination he testified:

"I have authority to stop a train after it has gone into motion in time of peril or danger. I did not stop the train on this occasion; I went to investigate it and nobody was hanging on there. It was reported to me by one of the expressmen, I suppose, someone hollered that there was someone on the side and that is the reason I went and investigated, and if he had been on I would have stopped the train and let him get on. I knew at the time that all of the compartment doors should have been closed and knew that one could not get into the train unless we would open the door. * * * I boarded the train while it was moving and got on at the last opening. At the time I reached the last opening the train was running about five miles an hour and any able-bodied man could have boarded the train without unnecessary danger to himself. That was the last opening on that train that any person could have gotten on. I did not learn as soon as I got on the steps of the train that a man was hanging on. I had gone a short distance when someone from the ground hollered to me that a man was hanging on the train. I did not report that to the conductor, that wasn't necessary; I went back and investigated and there was nobody hanging on; I went on until I could see plumb to the engine and nobody was hanging on. I did not report it to the conductor, nor did I stop the train, and if anybody had been hanging on there I would have had the authority to stop the train."

Ben Howard, for defendant, testified that he saw appellant swinging onto the side of the train with his foot on the steps and holding with both hands; that when he saw him the train was running slow; that he continued to swing on for some time.

J. C. Tanner testified that he saw appellant swinging onto the train; that the door in front of where appellant was standing on the steps was closed; that there was a curve in the railroad near the starting point of the train; that appellant fell off just at the beginning of the curve; that when he fell he was two car lengths below Sixth street, east of Sixth street, and at that time he was hanging to the colored coach, he was about two car lengths from where he started.

There is no evidence to justify the statement in the majority opinion that Sixth street, near which appellant fell from the train, was *apparently* more than two blocks from where appellant got on the train; but to the contrary, there is evidence tending to show that Sixth street was situated less than one block from where the train started, at the time in question.

There was also no warrant for the statement in the majority opinion that none of the operatives of the train "made any effort to use either one of the two concededly sufficient means that were then at hand for averting

the injury—stopping the train, or opening the door."

The undisputed evidence is that as soon as the operatives of the train were told that a man was seen hanging onto the train, the conductor immediately went to the first opening and looked along the outside of the train, and that at that time no one was hanging on to the train; that the conductor also told the porter to go to the doors and if any one was trying to enter to open the door and let him in; that both the porter and the brakeman did go to the doors of the coaches to see if any one was at such doors; and that they found no person at either of the doors.

To sustain their holding, the majority of the court must take the position that it was the duty of the train operatives, as soon as they heard that some one was hanging onto the train, to stop the train; of course, by signaling the engineer to stop it.

As already stated, the undisputed evidence shows that the train conductor in the present case was suddenly notified by some one from the outside of his train that a man was hanging onto the train in such manner as placed him in a perilous position. While it is settled law that when those in charge of a railroad train discover a person in a perilous position by reason of the movements of such train, and it becomes apparent that such person could not or would not extricate himself from the dangerous situation, it becomes the duty of those in charge of such train to use the means at their hands to prevent injury to such person, but it is also well settled that to render a railroad company liable for injuries received by one seen in a perilous situation from the movement of its train, under the theory of discovered peril, it must appear that the agents of such railroad company in charge of such train failed under the circumstances confronting them to use such means at their command as in their best judgment would avoid the injury. The omission to use all of several means at their command, or in fact to use the most effective means of the several to avoid the injury, does not necessarily constitute a breach of duty for which the railroad company would be liable.

Under the facts of the present case the conductor in charge of the train was suddenly notified that a man was hanging on his train. His immediate and instant action to avert the injury was demanded. Under such circumstances he exercised his best judgment quickly, as the case demanded, and sought to use the most effective means at his command to avoid the injury. The choice of only one of such means did not constitute actionable negligence, though the means used did not in fact avert the injury complained of.

It was substantially held in Missouri, Kansas & Texas Ry. Co. v. Trochta (Tex. Civ. App.) 181 S. W. 761, 764, and G., H. & H. Ry. Co. v. Sloman (Tex. Civ. App.) 244 S. W. 268, 274, writ of error denied, that where an engineer of a train was obliged to choose instantly between several means at his command calculated to avert an accident after he had discovered the peril of another, the choice made of one of such means only did not convict him of negligence. I think the rule announced by these two decisions is applicable to the present case.

One situated as was the conductor in the present case should not be held to the same accountability as is a person afforded time to deliberate.

In Henson v. Ry. Co., 301 Mo. 415, 256 S. W. 771, 774, quoting from Grout v. Electric Ry. Co., 125 Mo. App. 552, 102 S. W. 1026, it is said:

"The humanitarian duty deals only with the actual facts of a present situation, and has no concern with the question of what might have been done under different conditions."

In Ry. Co. v. Trochta, supra, it is said:

"If the engineer did what to a prudent man would have seemed reasonable in order to save the life of the deceased, he being compelled to choose his line of action upon the instant and almost, as it were, by instinct, without time to reason as to the comparative safety of two methods open to him, we do not think that because the subsequent event may show that he made a mistake as to the most efficient method of avoiding the danger he was thereby guilty of negligence."

In Ry. Co. v. Sloman, supra, it is said:

"Appellee seemingly contends that, in the short space intervening between the notice of the danger of the deceased was passed from the fireman to the engineer, the engineer should have sounded the whistle, sanded the track, cut off the steam, and applied the air brakes. In the case of M., K. & T. Ry. Co. v. Trochta (Tex. Civ. App.) 181 S. W. 761, the court held that where the engineer was obliged to choose instantly between attempting to stop the train or blow the whistle to warn the injured party who was approaching the railway track at a public crossing, choice of attempt to stop was not negligence."

The only fact proven which the majority can seriously contend raised the issue of discovered peril is that after some one had told the operatives of the train that a man was hanging onto the train they did not stop the train. Such contention is not tenable for two reasons; (1) Because the undisputed evidence shows that appellant had fallen from the train before such operatives were told that he was hanging to the train; and (2) because such operatives, when suddenly told of appellant's peril, acted promptly to avert the threatened danger, using their best judgment as to the means to be used to effect such end.

The writer, believing that there was no evidence calling for or authorizing the submission of the issue of discovered peril, thinks that it would be a grave injustice to reverse the judgment of the trial court because such issue was not submitted.

### On Motion for Rehearing.

PLEASANTS, C. J.

A reinvestigation of the record has led me to the conclusion that the majority of this court erred in our original opinion in holding that the evidence in this case raises the issue of discovered peril. I agreed with Justice GRAVES in the original opinion that the pleadings and the evidence raised that issue in the failure of the operatives of defendants' train to stop the train after they discovered that the plaintiff was on the steps of a closed door of one of the cars attempting to board the moving train.

 While the pleadings are inartistic and somewhat vague and indefinite, I am still inclined to adhere to the conclusion that the allegations of the petition that defendants' employees "negligently failed to stop said train when they discovered that plaintiff was in a position of peril in trying to reboard and reenter said train" are as against a general demurrer sufficient to raise an issue of discovered peril, and if there was evidence in the record tending to show that any of the operatives of the train, after knowing that plaintiff was on the step of the closed door of the moving car attempting to reboard it, failed to stop the train, the issue of discovered peril should have been submitted to the jury. But, as before stated, I am constrained to recede from my former conclusion that the evidence raises that issue, and to agree in the conclusion of the dissenting opinion of Justice LANE that the uncontroverted evidence shows that plaintiff had fallen from the steps of the car before any of the train operatives discovered or were informed that he was hanging on the steps to a closed door of the car in his effort to reboard the train.

The only members of the crew who could have had knowledge or information of this perilous situation of the plaintiff were the conductor, the porter, and a brakeman on the train.

The conductor testified that he got on at the front door of the front car of the train after the train was in motion, and that the train had moved something like seventy-five feet at the time he closed the door. The car on which the conductor entered was divided into three compartments, the front section for colored women, the second section being the smoker for colored men, and the third the smoker for whites. After closing the door he proceeded to take up the tickets of passengers, and had gotten through the front section and was taking up tickets in the second section when some one hollered to him that somebody was hanging on the train. He was then in the middle of the second section, and he told the porter to run out and if he found anybody to let him in. This was the first information he had that anybody was hanging on the train.

When this occurred the train had reached the Brewery Curve, which was about two blocks from where it started. This testimony is not contradicted by any evidence in the record, unless it be the statement of the plaintiff that just after the train started he attempted to board the front car at the door the conductor got on and the conductor closed the trap and slammed the door in his face and knocked him off the steps. The findings of the jury are conclusive against this testimony of the plaintiff.

The undisputed evidence shows that the plaintiff was found on the ground in his injured condition at a point 360 feet from where the train started. These facts conclusively show that the plaintiff had fallen from the train before the conductor was informed that any one was hanging on the steps trying to board the train.

The evidence is equally conclusive that when the porter was informed some one was hanging on the train, it was after the plaintiff had fallen from the steps of the car. The information upon which the porter reported to the conductor that somebody was hanging on the train was thus stated by him:

"Last May on the night train leaving Houston, I heard something about someone losing a hat and hanging on the train as that train left Houston. Mr. Thompson told me about it. He told me his boy said a colored man had let his hat fall off the train and got off to get it and saw him fall under the train and that he thought it killed him."

This testimony of the porter is corroborated by the testimony of Mr. Thompson, who testified as follows:

"I reported that to the porter. As soon as he came in, I told him that they ran over somebody back there and I thought it was a negro boy and then he reported to the conductor as soon as he could."

As to when the brakeman on the train first learned that plaintiff was hanging on the outside of the train, the undisputed evidence shows that it was when the last car on the train on which he was stationed was passing Sixth street. The evidence as to the length of the train and the distance beyond Sixth street of the place where plaintiff fell from the train conclusively shows that he had fallen before the brakeman was informed that he was hanging on the outside of the train. The undisputed evidence shows:

"There were six cars in the train; behind the engine were two baggage cars, then came the compartment car, next the first white

coach, then the second white coach and last the pullman car. Teal was hanging either on the rear end of the colored coach or the front end of the first white coach. This would place him three car lengths from the rear end of the train where the brakeman was riding as the train departed.

"Now, as the rear end of the train was passing over Sixth Street, the expressman hollered to the brakeman, who was on the rear end of the train, that a man was hanging on the train. When the rear end of the train was at Sixth Street, the point where Teal had been hanging was three car lengths East of Sixth Street. He was no longer hanging there because the positive uncontroverted evidence shows that Teal fell off at a point two car lengths East of Sixth Street."

The witness Tanner testified in this regard as follows:

"The start off of the curve was right there where he fell. He fell just at the start off of that curve; that curve makes quite a bend in there. I saw him fall; he was about two car lengths below Sixth Street. * * * I judge it was about two car lengths from Sixth Street that the man fell off the car, East of Sixth Street."

In this state of the record the majority of the court erred in holding that the issue of discovered peril pleaded by the plaintiff was raised by the evidence. All of the members of this court agree that unless the issue of discovered peril is raised by the evidence the finding of the jury that the plaintiff's contributory negligence was the proximate cause of his injury requires an affirmance of the judgment. My concurrence in the opinion of Justice LANE that the evidence does not raise this issue requires that our former judgment reversing the judgment of the trial court be set aside and that judgment be affirmed, and it is so ordered.

Justice GRAVES dissents from this order and adheres to the conclusion expressed in our original poinion.

### On Appellant's Motion for Rehearing.

In a lengthy motion for rehearing containing many unnecessary repetitions of the testimony of witnesses and the arguments of counsel thereon, appellant vigorously assails the conclusions of the majority of this court that the judgment should be affirmed.

Among many other complaints, it is pointed out that none of the former opinions in the case filed by the several members of the court expressly dispose of any of appellant's assignments except those relating to the questions of the sufficiency of the pleadings and evidence to raise the issue of discovered peril. An examination of the opinions sustains this criticism. We did, however, carefully consider each and all of the nine propositions presented in appellant's brief, and all of the members of the court reached the conclusion that except those raising the question of the sufficiency of the pleadings and evidence to require the submission to the jury of the issue of discovered peril, each and all were without merit and should be overruled, and that no detailed or categorical statement or discussion of the several propositions was required. This is fairly implied from each of the former opinions, but appellant is entitled to this express holding on all of his assignments.

Appellant also complains of the following statement in the opinion of the writer on appellees' motion for rehearing:

"The undisputed evidence shows that the plaintiff was found on the ground in his injured condition at a point 360 feet from where the train started. These facts conclusively show that the plaintiff had fallen from the train before the conductor was informed that anyone was hanging on the steps trying to board the train."

This statement is probably inaccurate in fixing the exact number of feet from the place where the train was started to the place at which appellant fell from the steps of the car and received his injuries. If so, the inaccuracy is immaterial, since the undisputed evidence shows that the place at which appellant fell from the car was not more than two or three car lengths east of Sixth Street, and that the conductor did not learn of appellant's being on the steps of the car until the train was going around the Brewery Curve, some 600 feet east of Sixth street.

Another complaint is voiced against the following statement in the opinion just mentioned:

"As to when the brakeman on the train first learned that plaintiff was hanging on the outside of the train, the undisputed evidence shows that it was when the last car on the train on which he was stationed was passing Sixth street."

This statement, which is copied from appellee's motion for rehearing, may also not be entirely accurate. But the uncontradicted evidence does show that appellant remained holding on the steps of the car for only a short distance after he caught it and got upon the steps, and when the witness Compton called to the brakeman that some one was hanging on the steps it was after the car which the appellant was attempting to board had crossed Sixth street, and the car in which the brakeman was riding was necessarily near Sixth street. At any rate, there is no evidence from which a reasonable inference can be drawn that the brakeman learned of appellant's peril in time to have avoided his injury by stopping the train. Any holding that the brakeman did know of appellant's peril in time to have avoided his injury by having the

train stopped can only be based on a mere surmise or suspicion, which our courts have uniformly held to be insufficient to raise a' fact issue for a jury.

The majority of the court are of the opinion that appellant's motion for rehearing should be overruled, and it has been so ordered.

Overruled.

GRAVES, J. (dissenting).

After the fuller light of two rehearings, accompanied each time by an individual re-reading of the entire statement of facts, were this member now again privileged to write an opinion for the court in this cause, it would be but a reiteration of that so delivered upon original submission; each and all of the findings from the facts there expressed are here emphatically repeated by him as reflecting the actual state of the record, in contradistinction to those arrived at by the CHIEF JUSTICE in his opinion on the appellees' motion for a rehearing; since the apparently three-way division on the case as a whole has finally ensued in this tribunal, it may be fortunate for the litigants that the one presently material point of difference—whether the evidence raises the issue of discovered peril—is purely a question of law, of which the Supreme Court will have jurisdiction: I insist that it does, agreeably to the conclusions of the first majority opinion of this court, but, in view of the very full restatement of the evidence in appellant's motion for rehearing that becomes a part of the record, which, it seems to me, makes that deduction an inescapable one, a further collation of it is forborne; that motion, in my opinion, should have been granted; an earnest protest against its having been refused is respectfully entered.